*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CURL, Minors.

UNPUBLISHED
October 29, 2024
3:40 PM

No. 369148
Genesee Circuit Court
Family Division
LC No. 04-118920-NA

Before: RIORDAN, P.J., and YOUNG and WALLACE, JJ.

PER CURIAM.

Respondent-mother appeals by right the circuit court order terminating her parental rights to her two children under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (child at risk of harm if returned to parent). We reverse and remand for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

The children at issue in this case, MMC and MEC, were born on September 15, 2014 and August 22, 2015, respectively. Prior to their births, respondent-mother had her parental rights to one of two previous children terminated. See *In re Dunbar-Wildman*, unpublished per curiam opinion of the Court of Appeals, issued October 21, 2008 (Docket No. 280472). In that case, we affirmed termination because respondent-mother, who tested positive for cocaine at the time of giving birth, "had been unsuccessful, for a significant period of time, in addressing the housing issue and her substance abuse problem," and she had been unable to maintain sobriety or housing in the year before termination. *Id*. at 2.

The record here reflects no involvement of Children's Protective Services (CPS) or the Department of Health and Human Services (DHHS) from the birth of the children until 2018, when a case with DHHS involving substance abuse and domestic violence was opened. Less than a year later, the trial court took jurisdiction over the children on the basis that respondent-mother had improperly supervised them after a complaint that respondent-mother was found to be intoxicated inside a vehicle and was preparing to drive with the children in the car. At one progress report hearing, the prosecutor stated that "honestly, this is my favorite case . . . both parents have been

-1-

super compliant. Every time I ask them to do something, they ask when where, and how?" Soon after this positive report, the children were returned to respondent-mother's home with the attorney for the children remarking that "I think mom should be proud of the work she has done."

In February 2021, DHHS petitioned to reopen respondent-mother's case. Respondent-mother pleaded no contest to allegations that the children saw respondent-father abusing her and called 911. As a result of respondent-father's violence, respondent-mother was hospitalized for a broken jaw, two black eyes, and bleeding on the brain. The court assumed jurisdiction over the children on the basis of respondent-mother's plea. At a preliminary hearing in March 2021, respondent-mother had been 43 days sober and the trial court agreed to keep the children at respondent-mother's house, over an agency request to transfer the children to their maternal aunt. The trial court ordered respondent-mother to continue substance-abuse treatment and drug screens, participate in mental-health treatment, obtain or maintain housing and a legal source of income, and maintain the no-contact order with respondent-father as part of its initial order of disposition.

Eventually, respondent-mother agreed to participate in an in-patient substance use program, and agreed to the children being placed with their maternal aunt. Respondent-mother was actively searching for a different family placement, however, because maternal aunt was "speaking badly of [mom] in front of the children" and making scheduled visitations difficult. By October 2021, respondent-mother had completed her inpatient program, however, placement with the maternal aunt continued to allow respondent-mother to further demonstrate her ability to stay substance-free. In January 2022, the court noted that while respondent-mother had some positive test results for substances over the last few months, overall, progress had been made. Of particular note was respondent-mother's established relationship with a therapist. Placement remained with the maternal aunt because the court observed it could not legally mandate a change to what was a voluntary placement.

In March 2022, respondent-mother and respondent-father allegedly appeared at maternal aunt's home unannounced and intoxicated. As a result, the children were formally removed from respondent-mother's care. In April 2022, DHHS proposed that the children's permanency goal change from reunification to guardianship with their maternal aunt, but respondent-mother opposed the change and the court denied the request to change the goal.

The record from a July 2022 hearing reflects that respondent-mother had completed her parenting classes and was actively participating in outpatient therapy for alcohol and narcotics abuse. From the last 18 drug screens she had taken, one was positive for cocaine and five were positive for substances other than cocaine. Respondent-mother underwent a psychological evaluation, and enrolled in outpatient behavioral health programming. She did not obtain a separate, recommended psychiatric evaluation. She had missed several scheduled parenting time visits but counsel for respondent-mother explained that those absences were due to illness and work being done on her home. The court continued with the agency recommendations, stating that while there were some positives here, "mom, especially, needs to have a longer pattern of being clean before we can recommend reunification." Although respondent-mother had an additional positive test for cocaine in the interim, at an October 2022 hearing, DHHS was given discretion to expand respondent-mother's parenting visits to unsupervised or overnight visits and the goal remained reunification.

But, in November and December 2022, respondent-mother was positive for cocaine and benzodiazepines and supervised parenting time resumed. At a February 2023 hearing, the no-contact order between respondents was lifted after representations that the domestic-violence situation had been resolved and by that point, respondent-mother was enrolled in Odyssey House programming for substance abuse treatment. The court agreed with DHHS to change the goal to termination of parental rights. At a follow up hearing in April, incidents of domestic violence that had not been previously acknowledged were placed on the record and the trial court suspended all parent visits and changed respondent-father's goal to termination as well. The court declined to reinstate the no contact order between respondents stating that they could "keep talking . . . keep dealing with each other . . . keep engaging in [domestic violence], substance abuse, whatever, whatever you want to do. You're grown. The only thing you will lose is your children." The Court added that it was "not concerned with [respondent-mother] at all right now. It is concerned with those babies."

At a May 2023 hearing, DHHS stated that once the placement goal changed to termination, they had no services in place any longer for respondent-mother. Nevertheless, respondent-mother had enrolled herself into Odyssey House for further treatment. By July, respondent-mother had also completed a parenting class. Around that time, respondent-father passed away. DHHS would later report that there were no verified incidents of domestic abuse between respondent-father and respondent-mother from January or February 2023 through the date of his death.

Respondent-mother reenrolled herself in Odyssey House for further programming, following a relapse around the time of respondent-father's death. Respondent-mother also requested a visit with her children to grieve the loss of their father. Respondent-mother had not been able to attend the funeral or visitation with her children. The court denied that request, telling respondent-mother "we are at a place where your parental rights will likely be terminated." At a November 2023 pre-trial hearing, respondent-mother was still enrolled in Odyssey House.

The termination hearing was held over two days at the end of November 2023. The children's caseworker testified that respondent-mother had not completed her mental health treatment and had some positive drug screens revealing cocaine, benzodiazepine, and opiate use. The caseworker also testified that respondent-mother had been "doing well" at her treatment at Odyssey House but had never completed the full programming there. She testified that she believed Odyssey House to be a beneficial program. She testified that respondent-mother had stable housing and some "odd jobs" for employment. While the caseworker did not believe respondent-mother benefitted from her substance abuse classes, she did testify that respondent-mother completed and benefitted from parenting courses. Overall, though, the caseworker believed mom to be too unstable with respect to her substance use to parent her children. She also added that the children "love the[ir] parents" and have a bond with respondent-mother.

The maternal aunt testified as to the family history of substance use issues and her willingness to adopt the children. She testified that if respondent-mother "is in a good place, she's sober, she's being responsible" she could have contact with the children. She testified that the children "love their mom" and are "sad" that they cannot return home to her. Maternal aunt commented, too, that respondent-mother "look[s] very good now."

Respondent-mother's substance-abuse therapist testified that respondent-mother had committed to 90 days in the inpatient program, that she had progressed to the second of four levels, and that she had demonstrated progress. The therapist observed two phone calls between respondent-mother and her children following the death of respondent-father. She testified that the children asked when they were going to come home. The therapist believed that respondent-mother could parent the children, and further testified that the children could live with respondent-mother during the program. The therapist also testified that the program usually took up to two years.

Respondent-mother testified her goal was to get her children back. She also testified she owns her home, is prepared for her children to come home to it, and that she has successfully taken domestic violence courses to better understand healthy relationships. She testified that prior to respondent-father's death, she had violated the no contact order with respondent-father, but it was regarding events like a colonoscopy and car repair. Respondent-mother testified she intends to finish her programming at Odyssey House, which began following a relapse after respondent-father died. Respondent-mother testified she feels "safe there" and "loved there" at Odyssey House.

DHHS requested termination citing MCL 712A.19b(c)(i), (g), and (j). The attorney for the children questioned respondent-mother's ability to stay sober. Respondent-mother's attorney asked that in lieu of termination, the court afford respondent-mother some parenting time and argued that the state had failed to meet its burden by clear and convincing evidence given respondent-mother's present sobriety and bond with the children.

After the hearing, the trial court found that the children had been repeatedly placed in foster care because of substance abuse, domestic violence, and neglect. It found that respondent-mother had been ordered to complete substance-abuse services, drug and alcohol screens, a psychiatric evaluation, and parenting classes. Respondent-mother tested positive for substances throughout the case and did not fully complete her mental-health services. She had twice participated in inpatient substance-abuse treatment but had not completed it. Further, respondent-mother had continued contact with respondent-father, prior to his death, and she had lied about her sobriety. The court found that respondent-mother had shown no benefit from her substance-abuse treatment but some benefit from parenting classes. The court concluded that based on this record, "relapse may be inevitable." Ultimately, the court found that "at least one" of the enumerated statutory grounds supported terminating respondent-mother's parental rights.

Considering the children's best interests, the trial court found that the children did indeed have a bond with respondent-mother, who they loved, and that their placement with a relative weighed against termination. However, it found that the children were thriving and happy in their foster home, which was willing to adopt them. In contrast, the children did not have stability with respondent-mother for any significant periods of time. Comparing the two environments under MCL 722.23 of the Child Custody Act of 1970, MCL 722.21 *et seq.*, the court concluded that living in the foster home was in the children's best interests. It ordered respondent-mother's parental rights terminated. Respondent-mother now appeals.

## II. STANDARD OF REVIEW

This Court reviews for clear error the trial court's decision that petitioner has proven a ground for termination by clear and convincing evidence. *In re Curry*, 505 Mich 989, 991; 938 NW2d 735 (2020).[1] Clear and convincing evidence is clear, direct, and weighty evidence that allows the finder of fact to reach a conclusion without hesitancy. *Id.* "Clear error exists when some evidence supports a finding, but a review of the entire record leaves the reviewing court with the definite and firm conviction that the lower court made a mistake." *Id.* (quotation marks and citation omitted).

## III. STATUTORY GROUNDS

Respondent-mother argues that the trial court clearly erred by finding that statutory grounds supported termination. We agree. To begin, we note that the trial court did not expressly state the grounds on which it terminated respondent-mother's parental rights. At the beginning of its analysis, it restated three grounds requested by DHHS and ultimately concluded "at least one" was met. As a result, we review all three grounds and find that the trial court clearly erred in finding at least one was supported by clear and convincing evidence on this record.

### A. MCL 712A.19b(3)(c)

DHHS and the court cite to MCL 712A.19b(3)(c) and not any particularly subsection in the trial court. However, in the trial court, DHHS went on to provide the language that matches subsection (*i*) and DHHS on appeal cites that specific section, so we analyze that subsection only. MCL 712A.19b(3)(c)(*i*) provides that the trial court may terminate a parent's rights if

> [t]he parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> > (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

"This statutory ground exists when the conditions that brought the children into foster care continue to exist and are not likely to be rectified despite time to make changes and the opportunity to take advantage of a variety of services." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014) (quotation marks and citation omitted). Even if conditions improved, the court "may look to the totality of the evidence to determine whether a parent accomplished meaningful change in the conditions that led to adjudication." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 334; 985 NW2d 912 (2022).

---

[1] Supreme Court orders that have an understandable rationale are binding on this Court. *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).

In this case, the condition that brought the children into the court's jurisdiction was respondent-mother's plea of no contest to allegations that the children saw respondent-father violently beating respondent-mother. It is not permissible to terminate a parent's parental rights solely because the parent was a victim of domestic violence. *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011). However, the court may consider whether the parent's own behaviors harmed the children or exposed them to harm. *Jackisch/Stamm-Jackisch*, 340 Mich App at 334.

The record does not support that respondent-mother's own behaviors exposed the children to harm, nor does it support that the domestic violence existed and would continue. To begin, respondent-father died late in the court proceedings. Upon his death, the "conditions that led to the adjudication," his violent attacks on respondent-mother in front of the children, did not "continue to exist." MCL 712A.19b(3)(c)(*i*). Even with a less literal interpretation, like that MCL 712A.19b(3)(c)(*i*) contemplates conditions that are "rectified" rather than "nullified" or "mooted," there is evidence that, too, was accomplished. At the termination hearing, there were no reported incidents of domestic violence in the last 4-6 months of respondent-father's life and the court ultimately terminated the no contact order prior to respondent-father's death. To the extent the court found clear and convincing evidence to support termination of parental rights under MCL 712A.19b(3)(c)(*i*), it clearly erred.

## B.  MCL 712A.19b(3)(g)

MCL 712A.19b(3)(g) states that termination of parental rights may be warranted if, by clear and convincing evidence, the trial court finds "the parent, although in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care or custody within a reasonable time considering the child's age." The trial court observed that there was no record evidence to support that respondent-mother was employed. As an initial matter, the record reflects that respondent-mother did "odd jobs" and had some, albeit, inconsistent income sources. But even without evidence of steady employment, the record does not indicate a failure to provide proper care or custody. In fact, it indicates the opposite.

The maternal aunt and foster parent to the children testified that she received social security monies from respondent-father and food and monetary contributions from respondent-mother. Respondent-mother's home is paid for in full. The record reflects she has access to a vehicle and a willingness to work. We also note that the trial court rescinded supervised visitation and even with respondent-mother's progress in the months leading to trial, failed to reinstate visitation. We further note that at the time that respondent-mother's rights to the children were terminated, MMC was nine years old and MEC was eight years old and had established relationships with respondent-mother. If the trial court terminated parental rights under this standard, even in part, which we reiterate is not clear from the record, we are left with the definite and firm conviction that that the trial court made a mistake, particularly considering the age of the children.

## C.  MCL 712A.19b(3)(j)

MCL 712A.19b(3)(j) states that termination of parental rights may be warranted if, by clear and convincing evidence, the trial court finds "there is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to

the home of the parent." We begin by emphasizing the statutory language "*will be harmed*." The court makes much of the harm that *could* come to the children *if* respondent-mother were to relapse, an event the trial court believed to be "inevitable." And while there may be record evidence to support a reasonable likelihood of relapse,[2] there is no record evidence supporting a reasonable likelihood that the children will be harmed.

The trial court found that respondent-mother had been ordered to complete substance-abuse services, drug and alcohol screens, a psychiatric evaluation, and parenting classes. The court found that respondent-mother had relapsed at least five times, noting in particular that respondent-mother had entered inpatient treatment, progressed in treatment, left the program, relapsed, and then returned to the program. The court also found that respondent-mother had failed to follow through on her mental-health treatment and only partially benefited from parenting classes.

The record supports the trial court's concerns that respondent-mother's substance abuse remained unstable. It was noted at the termination hearing that respondent-mother's rights to another child had been terminated because of substance abuse. In respondent-mother's previous termination proceedings of her first two children, in 2004 and 2005, respondent-mother used cocaine in front of her daughter and her son tested positive for cocaine at birth. *Dunbar-Wildman Minor*, unpub op at 1. Respondent-mother had initial problems with drug-screening and substance-abuse service compliance, but she later had several negative drug screens. *Id*. at 1-2. This Court noted that it took respondent-mother three attempts to become sober. *Id*. at 3. In the instant case, in 2019, the children were removed from respondent-mother's care after a complaint was made that respondent-mother was preparing to drive while intoxicated with the children in the car, but she attended substance-abuse treatment and the children were ultimately returned to her home.

Early on in this case after her release from the hospital, respondent-mother's substance abuse was identified as an issue. Respondent-mother started an inpatient program but was discharged from it, and she did not sign up for any outpatient services. Respondent-mother continued to miss drug screens and test positive between October 2021 and January 2022. Respondent-mother appeared at the foster home while intoxicated in March 2022 and missed more drug screens. Respondent-mother received inpatient treatment in 2022 but left the program early. In July 2022, respondent-mother tested positive for cocaine. In September 2022, respondent-mother again tested positive for cocaine. Respondent-mother enrolled in inpatient treatment in September 2022 and remained there until the termination hearing. As the trial court acknowledged, despite many attempts at substance-abuse treatment, respondent-mother's history

---

[2] This is a predictable trajectory for individuals who suffer from substance use addiction. The National Institute of Health (NIH) cites multiple studies, albeit involving alcohol addiction, that "have shown relapse rates of approximately 50% within the first 12 weeks after completion of intensive inpatient programs that often last 4 to 12 weeks or more and can cost tens of thousands of dollars." The NIH goes on to note that "there have been no standard relapse prevention programs established." National Library of Medicine, Guenzel, Nicolas et al, *Addiction Relapse Prevention*, https://www.ncbi.nlm.nih.gov/books/NBK551500/ (accessed October 27, 2024).

with treatment establishes that she will do well for a time and then relapse.[3]  This is true.  What is also true is that at the time of trial, respondent-mother had been sober for months and was under the care and specialized treatment of professionals who also had space for the children.  Further, during her times of relapse, there was no evidence of harm to the children.  The record is devoid of evidence of physical harm to the children and while there is some record evidence of psychological harm, that is only as to the children observing the abuse of their mother, and the maternal aunt does not have them in therapy.  To the extent the court found clear and convincing evidence to support termination of parental rights under MCL 712A.19b(3)(j), it clearly erred.

## IV.  CONCLUSION

Because it was clear error to terminate parental rights under any of the statutory grounds alleged by DHHS, we reverse the termination order, and remand to the circuit court for further proceedings.  We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Adrienne N. Young
/s/ Randy J. Wallace

---

[3] Neither trial counsel nor appellate counsel for respondent-mother objected to the service plan based on disability, despite that "individuals who are participating in a supervised rehabilitation or drug treatment program are protected by the ADA if they are not currently engaging in the illegal use of drugs."  42 USC 12210(b)(2); 28 CFR. §§ 35.131(a)(2)(ii), 36.209(a)(2)(ii); and see, *The ADA and Opioid Use Disorder: Combating Discrimination Against People in Treatment or Recovery* <https://www.ada.gov/resources/opioid-use-disorder/> (published April 5, 2022, accessed on October 28, 2024). And, the "Department has obligations under the ADA that dovetail with its obligations under the Probate Code." *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017).  Because this record does not establish respondent-mother's disagnoses, if any, and because the parties did not raise any issue as to whether the Department reasonably accommodated that disability and what would be a "reasonable opportunity to rectify the condition" under MCL 712A.19b(3)(c), we decline to do so now.